UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMUEL PRABIR, on behalf of himself and
others similarly situated,

       Plaintiff,

  v.

BUKHARA INDIAN CUISINE, INC. d/b/a
INDIGO INDIAN BISTRO, BASERA INDIAN
CUISINE, INC. d/b/a BASERA RESTAURANT,
ANIL KUMAR and RENU KUMAR,

       Defendants.

No. 17-cv-3704

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR
MOTION FOR PREJUDGMENT ATTACHMENT**

JOSEPH & KIRSCHENBAUM LLP
D. Maimon Kirschenbaum, Esq.
Lucas C. Buzzard, Esq.
32 Broadway, Suite 601
New York, New York 10004
(212) 688-5640

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.  **DEFENDANTS ACTED WITH INTENT TO DEFRAUD OR FRUSTRATE THE ENFORCEMENT OF A JUDGMENT IN THIS ACTION** ............................................. 2

II. **DEFENDANT RENU KUMAR IS LIABLE AS AN EMPLOYER UNDER THE FLSA** .................................................................................................................. 7

III. **CONCLUSION** ........................................................................................................10

## I. DEFENDANTS ACTED WITH INTENT TO DEFRAUD OR FRUSTRATE THE ENFORCEMENT OF A JUDGMENT IN THIS ACTION

In support of their attachment motion, Plaintiffs submitted the affidavit of Opt-In Plaintiff Sydur Rashid, who continued to work for Defendants until approximately November 12, 2017, some six months after this lawsuit was filed on May 17, 2017.  *See* ECF No. 47 (Rashid Aff.)  In that affidavit, Plaintiff Rashid details the specifics of a number of conversations with Defendant Anil Kumar and members of his family between August and November 2017, replete with approximate dates, the medium over which the conversations took place, and the particulars of the issues discussed.  *See, e.g.*, *id.* ¶¶ 14-15 (conversation with Anil Kumar on "the Basera restaurant telephone" held "at the end of August 2017"); 16 (mid-September 2017 conversation with Rajani Rani on Plaintiff Rashid's "cell phone"); 19 (conversation with Anil Kumar on Plaintiff Rashid's "last day of work," November 12, 2017).  As discussed in Plaintiffs' opening brief, the detailed testimony in that affidavit provides *direct evidence* that Defendants Anil and Renu Kumar sought to transfer their assets and sell their businesses with the specific intent of frustrating the enforcement of a judgment in this lawsuit.  *See* Pls.' Mem. at 16-20.

In opposition, Defendants contend that Plaintiffs have not met their burden of demonstrating Defendants' requisite intent to defraud or frustrate the enforcement of the judgment. Defendants first argue that, even if this Court believed the statements made in Plaintiff Rashid's affidavit, his allegations "do not necessarily demonstrate the requisite intent." Opp'n at 6 (citing., 17 A.D.2d 135, 136 (1st Dep't 1962)).  Defendants rely on *Eaton Factors Co., Inc. v. Double Eagle Corp.*, a case that involved a warrant of attachment entered against the individual owners of a trucking company based on allegations that the company was disposing of corporate assets to defraud creditors of the individual owners.  *See* 17 A.D.2d 135, 136 (1st Dep't 1962).  The First Department determined, in relevant part, that the warrant was improper because "the requisite

1

showing of fraudulent intent on the part of the [individual owners] was not sufficiently made out by the alleged statements of certain of them to plaintiff to the effect that they had 'sold out all our assets' and that the plaintiff's judgment would be uncollectible." *Id.* at 136.

The result in *Eaton Factors* is unsurprising. The defendant in that case merely stated a fact – defendants had "sold out all our assets"; and the result of that fact – "the plaintiff's judgment would be uncollectible." Crucially missing were any allegations of intent linking the fact with the result—there was no showing that the *reason* for the disposal of assets was to render the judgment uncollectible. As a result, the *Eaton Factors* plaintiff did not meet its burden. *Id.*

This case presents an entirely different story. Here, there are a number of explicit statements of intent linking Defendants' disposal of assets directly to Plaintiffs' inability to collect on a judgment. The primary of these is Anil Kumar's statement that he was "selling Indigo and was trying to transfer his accounts to some other relatives *so that* he could 'show the court that he had no money to pay'" a judgment in this lawsuit. ECF No. 47 (Rashid Aff.) ¶ 15 (emphasis added). This statement is echoed and amplified by the statements of Anil Kumar's niece and nephew, who also told Plaintiff Rashid in August and September 2017 that "Anil Kumar and his wife, Renu Kumar, were planning to transfer their assets to someone else's name *so that* they would not have to pay" Plaintiff Prabir and that the Indigo restaurant had been sold "*so* [Anil Kumar] did not have to pay Mr. Prabir." *Id.* ¶¶ 11, 16 (emphasis added). Thus have Plaintiffs here demonstrated what the *Eaton Factors* plaintiff could not—that the *reason* for the disposal of assets was to frustrate the enforcement of a judgment in this action. Defendants' reliance on *Eaton Factors* is therefore entirely misplaced.

Defendants next assert that Plaintiff Rashid's testimony is "unreliable" as it is "unlikely Anil Kumar ever made such comments to Mr. Rashid." Opp'n at 6. Defendants make this

2

assertion based on their portrayal of Mr. Rashid's deposition in which, according to Defendants, Mr. Rashid "stated that in his six years working for Defendants he saw Anil Kumar 'only about five times." *Id.* How this calls into question the content of Rashid's affidavit, Defendants do not bother to explain. More importantly, however, it distorts Rashid's actual testimony.

The portion of the deposition transcript Defendants cite arose in the context of questions about whether Rashid had ever complained about certain behavior of Rajath Kumar, the general manager of Basera restaurant. The relevant portion of the transcript reads, in full:

> Q: Did you complain to anybody else besides Raj and Lakhwinder about these things you've mentioned?
> A: Yes. I often complained to his uncle and his cousin, Aneesh Kumar.
> Q: Do you know the name of the uncle?
> A: Anil Kumar, and the cousin is Aneesh.
> Q: How often *was the uncle at Basera*?
> A: Very rarely. In six years, I've seen him only about five times. He used to be busy with his restaurant and do not find the time to come here.

(ECF No. 55-4 (Rashid Dep. Tr.) at 14:12-21) (emphasis added). When Rashid's statement that he had "seen [Anil Kumar] only about five times" is placed in context, it is apparent that he was referencing the number of times Rashid had seen Anil Kumar *at Basera restaurant*. This is evident because (1) it was made in direct response to the question about "how often" Anil Kumar was "at Basera," and (2) he followed the statement with the reason Anil Kumar was "[v]ery rarely" at Basera—he was "busy with his restaurant [(Indigo)] and d[id] not find the time to come here" (*i.e.*, Basera). Rashid was never asked how many times he had interacted with Anil Kumar *in total*. Thus, Defendants' attempt to manufacture a credibility issue falls flat.

In fact, it is Defendants' witnesses whose credibility is extremely suspect, especially as their affidavit statements are accompanied by strategic omissions and by further blatant distortions of the record in their opposition filings. Although Defendants' witnesses, including Anil Kumar, have submitted affidavits denying that they made the statements attributed to them by Rashid,

3

those bare denials must be viewed through the lens of Anil Kumar's deliberate effort, while under oath, to obscure the date when Indigo actually sold.

Defendants accuse Plaintiffs of "read[ing] much" into Anil Kumar's testimony. But there is good reason for reading "much" into it. As discussed in Plaintiffs' opening brief, Anil Kumar's explicitly testified during his January 25 deposition that although Indigo was for sale, Defendants had been "unable to sell" it and "[a]s of *now* there [were] no such plans" to "*close*" that restaurant. ECF No. 46-2 (Anil Kumar Dep.) at 54:4-24 (emphasis added). Yet just ten days later, on February 5, Indigo was already being renovated by a new owner (which Defendants do not deny). Because of this improbably quick turnaround, Plaintiffs argued that the only "legitimate inference" that could be drawn was that Anil Kumar proffered deceptive testimony on whether there were plans to close the restaurant at the time of his deposition.[1] *See* Pls.' Mem. at 19.

Defendants' opposition confirms that Plaintiffs were right to question Anil Kumar's credibility. In their brief, Defendants attempt to explain away Plaintiffs' legitimate questions by stating that "[b]ecause the restaurant was not sold until after the deposition, it follows that the plans to close the business were also not made until after the deposition." Opp'n at 7. But this statement is completely unsupported by citation to a shred of evidence, much less evidence demonstrating when the sale actually occurred. *See id.* To the extent Defendants meant to cite Anil Kumar's affidavit in opposition, that evasive document provides them no assistance. There, Anil Kumar makes only the vague statement that the sale of Indigo occurred "in late January 2018." ECF No. 55-1 ¶ 2. It thus provides no support for Defendants' representation to this Court that the sale

---

[1] To be clear, Plaintiffs' questioning of the veracity of Anil Kumar's deposition testimony does not revolve around whether he truthfully testified about whether Indigo was for sale at the time of his deposition, as Defendants seem to believe. *See* Opp'n at 7. It revolves around whether he was telling the truth when he stated that Indigo *had not sold* and there were no plans to *close* the restaurant at that time.

4

occurred after the January 25 deposition. Moreover, although Anil Kumar states that he "worked with a broker to complete the transaction," *id.* ¶ 3, Defendants have provided no documentary proof of that transaction or when it occurred. To be clear—even though evidence that the sale took place after Anil Kumar's January 25 deposition would put to bed Plaintiffs' entire basis for questioning his credibility, Defendants have refused to submit such evidence. The only possible reason for this omission is the simplest: it does not exist.

Such evasiveness and failure to come forward with evidence negating Plaintiffs' evidence is itself indicative of the requisite intent to defraud. *See, e.g.*, *Coley v. Vanguard Urban Improvement Ass'n*, 2016 U.S. Dist. LEXIS 1272378, at *21 (E.D.N.Y. Dec. 13, 2016) (finding sufficient evidence of fraudulent intent based on plaintiff's evidence and "Defendants' evasiveness throughout these proceedings"); *Arzu v. Arzu*, 597 N.Y.S.2d 322, 325 (1st Dep't 1993) ("Their failure to provide plaintiff with an ongoing accounting or, at the very least, come forward with a contemporaneous record of the disposition of plaintiff's funds entitles us to conclude that they acted with an intent to defraud plaintiff, their creditor."); *Mishkin v. Kenney & Branisel, Inc.*, 609 F. Supp. 1254, 1256 (S.D.N.Y. 1985) ("It is significant that no defendant, corporate or individual, has negated the serious charges of fraudulent conduct made by the Trustees."). It also reinforces and confirms Rashid's original affidavit testimony—that Defendants were transferring assets and disposing of Indigo to demonstrate to this Court they could not fund a judgment.

Defendants' arguments about the October 2017 line of credit on the Kumar family home are not at all persuasive. The encumbering of that property with a $329,800 mortgage easily meets four of the six "badges of fraud" used to establish the "requisite actual intent to defraud." *CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-cv-5345 (AJN), 2016 U.S. Dist. LEXIS 82821, at *33-34 (S.D.N.Y. June 24, 2016) (listing the six badges of fraud). First, as Defendants admit, there is a

5

family relationship between the two parties who obtained the mortgage—Renu Kumar and her sister. *See id.* at *34 (identifying as one of the badges of fraud "the family, friendship or close associate relationship between the parties"). Second, the Kumar family has retained "possession, benefit [and] use of the property in question" following the issuance of the line of credit, *id.*, as demonstrated by the deposition testimony of Anil Kumar, Renu Kumar, and Rajani Rani that they all still currently live in the house, *see* Pls.' Mem at 18 (describing this deposition testimony).

Next, the line of credit obtained on the Kumar family home is just one incident in "a pattern or series of transactions" Defendants have undertaken since this lawsuit was filed in May 2017, the "cumulative effect of which" demonstrates fraudulent intent. The mortgage on the Kumar family home is bookended on the one end by the statements to Rashid in August, September, and October 2017 that Anil and Renu Kumar were transferring assets to "relatives" to avoid paying a judgment in this case, and on the other end by Anil Kumar's evasive deposition testimony concerning Indigo, described above. This pattern, coupled with Renu Kumar's exceedingly vague explanation as to where the proceeds of the line of credit went (to pay "numerous personal and business expenses"), is highly indicative of fraudulent intent. *See, e.g.*, *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 306 F. Supp. 2d 482, 487 (S.D.N.Y. 2004) (fraudulent intent found where, *inter alia*, the disbursement of proceed of property sales consummated after litigation had commenced was "hazy at best, and counsel for [defendants] could not explain where all the proceeds went and why").

Finally, "the general chronology of the events and transactions under inquiry" clearly leads to the conclusion that Defendants are acting with the intent to frustrate a judgment in this action. To reiterate: (1) Defendants put Indigo up for sale in June 2017, just one month after this lawsuit was filed, *see* ECF No. 46 (Buzzard Decl.), Exs. 16-17 (Listings); (2) from August to October

2017, Anil Kumar and his family members told Rashid that Anil and Renu Kumar were transferring assets and selling Indigo to avoid paying any money towards this lawsuit; (3) Defendant Renu Kumar and her sister obtained the $329,800 line of credit on the Kumar family home in October 2017, *see id.*, Ex. 14 (Mortgage Recording), and have provided only the vaguest of explanations about where that money went; (4) on January 25, 2018, Defendant Anil Kumar gave his evasive deposition testimony about whether Indigo had been sold; and (5) on February 8, 2018, defense counsel represented that despite the line of credit and sale of Indigo, which together amounted to approximately $431,800 ($329,800 line of credit and $102,000 from sale of Indigo), Defendants believed that Plaintiffs could not collect on any judgment entered in this matter, *see* Buzzard Decl., Ex. 18 (Email).  The totality of this chain of events, coupled with the existence of the other badges of fraud discussed above, are more than sufficient to meet Plaintiffs' burden on pre-judgment attachment.

## II. DEFENDANT RENU KUMAR IS LIABLE AS AN EMPLOYER UNDER THE FLSA

In their only challenge to Plaintiffs' likelihood of success on the merits, Defendants contend that Plaintiffs will be unable demonstrate that Defendant Renu Kumar is an "employer" within the meaning of the FLSA and NYLL.  To determine employer status in this context, courts look to whether the individual has "operational control" over the organization, which exists if the individual's role and responsibilities "directly affect the nature or conditions of the employees' employment."  *Irizarry v. Catsimatidis*, 722 F.3d 99, 107 (2d Cir. 2013).  This standard requires "some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations . . . or compensation." *Id.* at 109.  "[E]vidence indicating an individual's direct control over the plaintiff employees" is not the only evidence considered in this analysis.  *Id.* at 110 (cleaned up and quotation marks omitted).  "Instead,

7

evidence showing an individual's authority over management, supervision, and oversight of a company's affairs in general is relevant to the totality of the circumstances in determining the individual's operational control of the company's employment of the plaintiff employees." *Id*. (cleaned up and quotation marks omitted). "Operational control" need not be exercised constantly for an individual to be liable under the FLSA, *id*., and "[a]n employee may simultaneously have multiple employers within the meaning of the FLSA," *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 66 (2d Cir. 2003).

> The Second Circuit has delineated four factors to consider in making this determination:
>
> 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'

*Id*. at 104 (2d Cir. 2013) (quoting *Carter v. Dutchess Community Coll*., 735 F.2d 8, 12 (2d Cir. 1984)). These "*Carter*" factors do not "comprise a rigid rule for the identification of an FLSA employer," but rather "provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Irizarry*, 722 F.3d at 105 (citations and quotation marks omitted).

Here, the evidence demonstrates that Renu Kumar: (1) was present at Basera multiple times each week, *see* Buzzard Reply Decl., Ex. 1 (Rashid Dep.) at 36:15-20; (2) was one of two people with access to the Basera bank account (the other being Anil Kumar), and personally signed "most[]" checks issued from that account, *see id*., Ex. 2 (Renu Kumar Dep.) at 24; (3) signed all paychecks given to employees at Basera, *see id.* at 17:19-18:3 (stating she signed Basera employee paychecks "[w]henever my husband needs to pay them money"), Buzzard Reply Decl., Ex. 3 (Prabir Dep.) at 56:16-57:9 (testifying that he was paid by Renu Kumar at Basera and witnessed

8

her writing out the paychecks); (4) personally delivered paychecks to employees at Basera, *see* Rashid Dep. at 36:15-20; (5) described herself as the "bookkeeper" for Basera, *see* Renu Kumar Dep. at 25:5-10; (6) was responsible for regularly collecting cash from the safe at Basera, *see* Bhuiyan Dep. at 12:11-14, Rashid Dep. at 36:15-20; and (7) possessed and exercised the authority to oversee and direct employees' work at Basera, *see* Buzzard Reply Decl., Ex. 3 (Prabir Dep.) at 57:20-22 (testifying that Renu Kumar would come to Basera to "see how people do things and tell people what to do"), *id.* at 58:20-22 (testifying that Renu Kumar at Basera would "talk[] to everybody [and] tell[] people what to do. Basic management stuff.").

  This evidence demonstrates that Renu Kumar was an employer under the relevant test. First, with respect to operational control, her frequent visits to the Basera, her access to the restaurant's bank account, and her regular delivery of paychecks to and collection of cash from the restaurant demonstrate that her "involvement in the company's daily operations was [far] more than [a] symbolic or ceremonial" role. *Irizarry*, 722 F.3d at 116. To the contrary, she played a crucial, necessary, and ongoing role in the day-to-day operation and financial affairs of that business. *See Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 399, 353 (2d Cir. 2015) (individual "had access to [the company's] bank account and made personal purchases from it, thereby demonstrating his control over [the company's] financial affairs"); *Wang v. LW Rest. Inc.*, 81 F. Supp. 3d 241, 256-57 (E.D.N.Y. 2015) (denying summary judgment on individual liability where the individual had "involvement in the Restaurant's finances and connection to the operations and connection to the operations and regular functions of the Restaurant").

  The evidence also shows Renu Kumar satisfies at least the second and third *Carter* factors. Renu Kumar had and exercised the authority to supervise and control employees while at work, as demonstrated by Plaintiff Prabir's testimony that, while she was present at Basera she would

9

observe how employees "do things" and would tell them "what do to."  This authority to supervise is one of the hallmarks of employer status.  *See Irizarry*, 722 F.3d at 111.

Next, Renu Kumar undoubtedly met the third *Carter* factor given her near exclusive authority to sign and deliver paychecks to employees at Basera.  *See Herman v. RSR Sec. Servs.*, 172 F.3d 132, 140 (2d Cir. 1999) (explaining that one of the "key question[s]" in assessing the third *Carter* factor "is whether the [individual] had the authority to sign paychecks throughout the relevant period"); *see also Michalow v. E. Coast Restoration & Consulting Corp.*, 2017 U.S. Dist. LEXIS 108124, at 39-40 (E.D.N.Y. July 11, 2017) ("Indicia of authority to determine the method of compensation include the authority to sign paychecks throughout the relevant period.").  Thus, the totality of the circumstances demonstrates that Renu Kumar was much more than just the wife of Basera's owner—she had and exercised the authority to supervise and manage the restaurant's financial affairs and was "individually involved" in both the supervision and compensation of its employees.  *See Kim v. Kum Gang, Inc.*, No. 12-cv-6344, 2014 U.S. Dist. LEXIS 34602, at *13 (S.D.N.Y. Mar. 11, 2014) ("[A]ctive participation by an individual in directing employees' performance, signing payroll checks, dealing with record-keeping and other matters pertinent to FLSA compliance (or non-compliance) may justify deeming him an employer").  Accordingly, she is a proper defendant in this action and, for the reasons outlined above and in Plaintiffs' opening brief, the Court's attachment order should extend to her as well as all the other Defendants.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue an order of attachment attaching debts owed to and property of Defendants Anil Kumar, Renu Kumar, Bukhara Indian Cuisine, Inc., and Basera Indian Cuisine, Inc. located in the State of New York, valued at up to $515,819.

Dated: New York, New York
March 9, 2018

                              Respectfully submitted,

                              By: /s/ *Lucas C. Buzzard*
                              D. Maimon Kirschenbaum
                              Lucas C. Buzzard
                              JOSEPH & KIRSCHENBAUM LLP
                              32 Broadway, Suite 601
                              New York, NY  10004
                              (212) 688-5640

                              *Attorneys for Plaintiffs*